## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES SOTO, | ) | |
| | ) | |
| *Plaintiff,* | ) | No. |
| | ) | |
| *v.* | ) | |
| | ) | |
| WILLIAM FOSTER, ERNEST | ) | |
| HERNANDEZ, JAMES SCHMIDT, B. | ) | |
| MILLER, E. LABIAK, STEPHEN CASTO, | ) | |
| THOMAS RICHARDSON, THOMAS | ) | **JURY TRIAL DEMANDED** |
| PTAK, MICHAEL DUFFIN, RICHARD | ) | |
| SOLITA, REYNALDO GUEVARA, R. | ) | |
| JOHNSON, DENNIS MADERAK, W. | ) | |
| ANDERSON, IVORY HAMPTON, | ) | |
| ANTHONY PECORARO, ANTHONY | ) | |
| KUTA, ROMAN TAPKOWSKI, R. | ) | |
| KUROWSKI, S. BYCZEK, VINCENT | ) | |
| TONDRYK, KENNETH MANN, P. | ) | |
| WILINDEZ, STRAZA, MICHAEL | ) | |
| MCMEEL, EVANS, NORBERT FERET, | ) | |
| EARL ZUELKE, E. PICKETTE, PHILLIP | ) | |
| SZPICKI, N. DUB, JOHN REGAN, the CITY | ) | |
| OF CHICAGO, GREGG OWEN, TIMOTHY | ) | |
| MCMAHON, JACK SMEETON, and COOK | ) | |
| COUNTY, and UNIDENTIFIED POLICE | ) | |
| OFFICERS, | ) | |
| | | |
| *Defendants.* | | |

## COMPLAINT

Plaintiff James Soto, by his attorneys, Loevy & Loevy, complains of Defendants William Foster, Ernest Hernandez, James Schmidt, B. Miller, E. Labiak, Stephen Casto, Thomas Richardson, Thomas Ptak, Michael Duffin, Richard Solita, Reynaldo Guevara, R. Johnson, Dennis Maderak, W. Anderson, Ivory Hampton, Anthony Pecoraro, Anthony Kuta, Roman Tapkowski, R. Kurowski, S. Byczek, Vincent Tondryk, Kenneth Mann, P. Wilindez, Straza, Michael Mcmeel, Evans, Norbert Feret, Earl Zuelke, E. Pickette, Phillip Szpicki, N. Dub, John Regan, unidentified Police Officers, the City of Chicago, Cook County Assistant State's Attorney Gregg Owen, Timothy McMahon, and Jack Smeeton, Cook County, Illinois, and as-yet unknown employees of the City of Chicago and Cook County, and states as follows:

1

## INTRODUCTION

1.      James Soto was wrongfully convicted of a 1981 double murder in Pietrowski Park in Chicago. In 1982, Mr. Soto was sentenced to life without parole. After spending over forty-two years incarcerated for a crime he did not commit, he was exonerated in December 2023.

2.      Mr. Soto had nothing to do with the Pietrowski Park murders, and has always maintained his innocence.

3.      Not one piece of physical evidence ever connected Mr. Soto to the crime.

4.      The only evidence against Mr. Soto at his trial in 1982 was the coerced and fabricated testimony of Wally Cruz, whom police believed was involved in the crime.

5.      Cruz's fabricated story was demonstrably false.

6.      Defendants knew that Cruz's fabricated story was false.

7.      Unknown to Plaintiff, his counsel, or the prosecutors at the time, Defendants coerced Cruz's fabricated story to inculpate Mr. Soto, and Defendant Officers fabricated police reports to conceal their misconduct.

8.      Defendants caused the arrests of over a dozen witnesses without probable cause and used improper tactics to coerce those witnesses into making false statements to inculpate Mr. Soto.

9.      Defendant Officers then fabricated police reports documenting those coerced false statements and never disclosed these fabrications to the prosecution, to Mr. Soto, or to his counsel.

10.     Defendants built an entirely false case against Mr. Soto by fabricating false evidence and suppressing exculpatory evidence that Mr. Soto could have used to defend himself in the criminal trial against him. As a result, Mr. Soto was convicted of murder.

11.     Mr. Soto worked tirelessly for years to show that he had absolutely nothing to do with this crime.

12.     In December 2023, after decades fighting for post-conviction relief, Mr. Soto's conviction was finally vacated. The prosecutors dropped all charges. Forty-two years after this horrific ordeal began, Mr. Soto was exonerated.

13.     Mr. Soto now seeks justice for the harm that Defendants caused and redress for the loss of liberty and hardship that he endured and continues to suffer as a result of Defendants' actions.

## JURISDICTION AND VENUE

14.     This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

15.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper under 28 U.S.C. § 1391(b). Most or all of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

17.     Plaintiff **JAMES SOTO** is a 63-year-old Latino man from Chicago who spent 42 years in prison for a crime he did not commit.

18.     While spending over four decades wrongfully incarcerated, Mr. Soto took vocational courses, received college credits, tutored Spanish-speaking peers, worked in the law

library, and became a member of the United States Junior Chamber, a leadership training service organization.

19.     In November 2023, a month before he was freed, Mr. Soto graduated *magna cum laude* with his bachelor's degree as part of the first cohort of Northwestern University's prison education program. Mr. Soto currently works as a paralegal and plans to go to law school.

20.     At all relevant times, Defendant **WILLIAM C. FOSTER, STAR #3188** was a police detective in the Chicago Police Department ("CPD") acting under color of law and within the scope of his employment for the City of Chicago.

21.     At all relevant times, Defendant **ERNEST M. HERNANDEZ, STAR #5388** was a police detective in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

22.     At all relevant times, Defendant **JAMES H. SCHMIDT, STAR #895** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

23.     At all relevant times, Defendant **B. MILLER, STAR #7854** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

24.     At all relevant times, Defendant **E. LABIAK, STAR #2350** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

25.     At all relevant times, Defendant **STEPHEN J. CASTO #15489** was a police detective in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

26.     At all relevant times, Defendant **THOMAS J. RICHARDSON, STAR #3385** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

27.     At all relevant times, Defendant **THOMAS PTAK** was a police detective in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

28.     At all relevant times, Defendant **MICHAEL F. DUFFIN** was a police detective in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

29.     At all relevant times, Defendant **RICHARD J. SOLITA** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

30.     At all relevant times, Defendant **REYNALDO GUEVARA** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

31.     At all relevant times, Defendant **R. JOHNSON, STAR #15536,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

32.     At all relevant times, Defendant **DENNIS S. MADERAK, STAR #3251,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

33.     At all relevant times, Defendant **W. ANDERSON, STAR #13003,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

34.     At all relevant times, Defendant **IVORY L. HAMPTON, STAR #7021,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

35.     At all relevant times, Defendant **ANTHONY J. PECORARO, STAR #2683,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

36.     At all relevant times, Defendant **ANTHONY W. KUTA, STAR #4527,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

37.     At all relevant times, Defendant **ROMAN S. TAPKOWSKI, STAR #15665,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

38.     At all relevant times, Defendant **R. KUROWSKI, STAR #755** was a police sergeant in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

39.     At all relevant times, Defendant **S. BYCZEK, STAR #9539,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

40.     At all relevant times, Defendant **VINCENT J. TONDRYK, STAR #3492,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

41.     At all relevant times, Defendant **KENNETH E. MANN, STAR #6725,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

42.     At all relevant times, Defendant **P. WILINDEZ, STAR #8140,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

43.     At all relevant times, Defendant **STRAZA**, **STAR 11807**, was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

44.     At all relevant times, Defendant **MICHAEL L. MCMEEL, STAR #2198,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

45.     At all relevant times, Defendant **EVANS, STAR #12864,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

46.     At all relevant times, Defendant **NORBERT W. FERET, STAR #8550,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

47.     At all relevant times, Defendant **EARL W. ZUELKE, STAR #4053,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

48.     At all relevant times, Defendant **E. PICKETTE, STAR #12386,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

49.     At all relevant times, Defendant **PHILLIP SZPICKI**, **STAR #4014,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

50.     At all relevant times, Defendant **N. DUB, STAR #5243,** was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

51.     At all relevant times, Defendant **SGT JOHN T. REGAN, STAR #1864** was a police detective in the CPD acting under color of law and within the scope of his employment for the City of Chicago. Defendant Regan and other unknown law enforcement officers supervised the Police Officer Defendants, and participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom Defendant Regan and other unknown law enforcement officers supervised.

52.     Defendants Foster, Hernandez, Schmidt, Miller, Labiak, Casto, Richardson, Ptak, Duffin, Solita, Guevara, Johnson, Maderak, Anderson, Hampton, Pecoraro, Kuta, Tapkowski, Kurowski, Byczek, Tondryk, Mann, Wilindez, Straza, McMeel, Evans, Feret, Regan, and other as-yet unidentified police officers are referred to collectively as "Defendant Officers."

53.     At all relevant times, Defendant **GREGG OWEN** was an Assistant State's Attorney with the Gang Crimes Unit of the Cook County State's Attorney's Office ("CCSAO"). He is sued for actions he undertook, in conspiracy with Defendant Officers, as an investigator and without probable cause to believe that Plaintiff had committed any crime. He acted under color of law and within the scope of his employment for the CCSAO.

54.     At all relevant times, Defendant **TIMOTHY MCMAHON** was an Assistant State's Attorney with the Gang Crimes Unit of the CCSAO. He is sued for actions he undertook, in conspiracy with Defendant Officers, as an investigator and without probable cause to believe that Plaintiff had committed any crime. He acted under color of law and within the scope of his employment for the CCSAO.

55.    At all relevant times, Defendant **JACK SMEETON** was an Assistant State's Attorney with the Gang Crimes Unit of the CCSAO. He is sued for actions he undertook, in conspiracy with Defendant Officers, as an investigator and without probable cause to believe that Plaintiff had committed any crime. He acted under color of law and within the scope of his employment for the CCSAO.

56.    Defendants Owen, McMahon, and Smeeton are referred to collectively as "ASA Defendants."

57.    Defendant City of Chicago ("the City") is a municipal corporation that is or was the employer of the above-named Defendant Officers. Each of the Defendant Officers acted during their investigation as agents or employees of the City. The City is liable based on *respondeat superior* for the acts of Defendant Officers. The City is additionally responsible for the policies and practices of the CPD.

58.    Defendant Cook County ("the County") is a governmental entity within the State of Illinois, which provides funding for the CCSAO and was at all relevant times the employer of Defendants Owen, McMahon, and Smeeton. The County is a necessary party to this lawsuit and is responsible for paying any judgment entered against Defendants Owen, McMahon, and Smeeton.

59.    Each individual Defendant is sued in his or her individual capacity.

## FACTS

### The Murders in Pietrowski Park

60.    On August 16, 1981, at around 9:30 p.m., a vehicle pulled up on a crowd in Pietrowski Park, a park on the southwest side of Chicago, firing shots. The shooters injured one and killed two others: a sixteen-year-old girl and a United States Marine who was home on leave.

61.    Investigators interviewed over 30 witnesses at the park, none of whom ever connected Mr. Soto to this crime.

62.     Eyewitnesses described a blue van and two shooters from within firing from a gangway beside the park – one with a rifle and one with a handgun.

63.     In the immediate aftermath of the shooting, witnesses named two perpetrators: 16-year-old Victor "Fat Victor" Rodriguez, and 22-year-old John "J.J." Rojas.

64.     Several eyewitnesses told investigators that Rodriguez was the handgun shooter, whom they recognized. Rodriguez was listed in initial reports as a presumed assailant.

65.     Eyewitnesses also mentioned that they saw Rojas driving the blue van. Rojas left the city after the shooting.

66.     Reports also mentioned other possible suspects, including the prosecution's star witness, Wally "Gator" Cruz. Cruz had heard the police were looking for him and also fled the state.

67.     In sharp contrast, there was no mention of Mr. Soto anywhere in any of the contemporaneous reports of the shooting. No eyewitness saw Mr. Soto at the scene or ever suggested that he was one of the shooters.

68.     At the time of his arrest, Mr. Soto had no criminal history, was a high school graduate, and had been working for United Parcel Service since he graduated from high school.

**Without Investigative Success, Defendants Turn to Cruz**

69.     In early October, after weeks of no investigative success, Defendants Foster and Hernandez, the lead detectives of this investigation, faced increasing pressure to act.

70.     On October 5, 1981, Defendants Foster and Hernandez secured the arrest of "Fat Victor" Rodriguez and stamped their report "cleared and closed." But Rodriguez had been charged as a juvenile, and  a juvenile court judge refused to grant a prosecution motion to move the case to adult court. The case against Rodriguez did not proceed.

71.     Turning to other avenues for closing the case, on or about October 14, 1981, Defendant Officers Foster, Hernandez, Schmidt, Miller, Labiak, Casto, Richardson, Ptak, and Duffin met with high ranking officials in the CCSAO to formulate a plan to implicate Mr. Soto and his cousin, David Ayala.

72.     Defendant Gregg Owen, then-Chief of the Gang Prosecutions Unit, and Defendant Jack Smeeton attended this meeting with Defendant Officers.

73.     During the meeting, the Defendant Officers and ASA Defendants Smeeton and Owen agreed to coerce Wally "Gator" Cruz into testifying falsely against Mr. Soto and his cousin Ayala to frame them for the Pietrowski Park murders.

74.     To conceal their plot, Defendant Officers withheld all reports concerning the content of their October 14, 1981 meeting with Defendants Owen and Smeeton deciding to target Mr. Soto and Ayala.

75.     On or around October 15, Defendants Foster and Hernandez contacted Cruz about meeting with Defendants Foster, Hernandez, Smeeton, and Owen at 26th and California, in the office of the Gang Prosecutions Unit.

76.     Defendants Foster, Hernandez, Owen, and Smeeton then intimidated Cruz into agreeing to testify falsely against Mr. Soto and Ayala.

77.     Defendants Foster, Hernandez, Owen, and Smeeton forced Wally Cruz to fabricate a false account concocted by Defendants of what transpired on August 16, 1981, implicating over a dozen people.

78.     These Defendants forced Cruz to falsely claim that, on the day of the shooting, there was a gang meeting in the basement of David Ayala's house, and Ayala ordered that the gang shoot up the park because members of the Latin Kings were present.

79. Defendants Foster, Hernandez, Owen, and Smeeton also forced Cruz to falsely claim that David Ayala gave Ruben Palomo a rifle and Mr. Soto a handgun, and that Palomo told Cruz to drive him and Mr. Soto to the park where the shooting took place.

80. Finally, due to the coercion of Cruz by Defendants Foster, Hernandez, Owen, and Smeeton, Cruz was forced to falsely claim that he let Mr. Soto and Palomo into an alley near the park, after which he heard gunshots, and the two ran back to the van saying they might have hit somebody.

81. The story that Defendants Foster, Hernandez, Owen, and Smeeton fed to Cruz was demonstrably false. Witnesses who supposedly attended the meeting could not have been there, a problem which the Defendants either knew or could have known with minimal investigation.

82. Not one of the individuals that Defendants Foster, Hernandez, Owen, and Smeeton coerced Cruz into falsely claiming was at Ayala's house and attended a gang meeting on the day of the shooting ever confirmed Cruz's fabricated story.

83. Defendants knew that the fabricated story that Defendants Foster, Hernandez, Owen, and Smeeton fed to Cruz was false.

84. Defendant Officers documented this fabricated account in their police reports. They never disclosed to the prosecutors, defense, or to Mr. Soto that this account was fabricated, nor did they reveal that they fed Cruz the narrative they wanted to create or the means they used to coerce him to comply.

85. The only witness ever to inculpate Mr. Soto – during the pretrial investigation or at the trial itself—was Wally Cruz.

86. Despite police interviews with dozens of eyewitnesses and over thirty people present at the park during the shooting, Cruz is the only person who ever claimed to have seen Mr.

Soto at the park the night of the shooting and the only person who ever claimed that Mr. Soto was the shooter.

### The Round-Up and Interrogations to Frame Mr. Soto

87.     After coercing Cruz's cooperation, Defendants designed a plan to arrest and coerce every person referenced in Cruz's false account of what transpired on August 16, 1981 into making false statements to cement their fabricated story.

88.     Defendant Officers arrested Mr. Soto, David Ayala, and at least a dozen others whom Cruz falsely claimed were involved in the August 16, 1981 gang meeting. They made these arrests without probable cause.

89.     One of more of Defendants, including Defendant Officers Foster, Hernandez, Schmidt, Miller, Labiak, Casto, Richardson, Ptak, Duffin, Solita, Guevara, Johnson, Maderak, Anderson, Hampton, Pecoraro, Kuta, Tapkowski, Kurowski, Byczek, Tondryk, Mann, Wilindez, Straza, McMeel, Evans, Feret, Zuelke, Pickette, Szpicki, Dub, and Regan, and ASA Defendants Smeeton, McMahon, and Owen, acting as investigators, used threats of harm and criminal charges to coerce over a dozen witnesses to provide false statements that would corroborate the initial fabricated story fed to Cruz by Defendants, knowing full well that they were fabricating false evidence which would result in Mr. Soto's wrongful prosecution and conviction.

90.     Defendants listed in the above-referenced paragraph arrested and held over a dozen witnesses without access to counsel or family, did not inform them of their rights, physically beat them, deprived them of sleep and food, harassed them, and threatened them in order to coerce their testimony against Mr. Soto.

91.     Even before her arrest on October 16, 1981, one or more of Defendant Officers, including Defendants Foster, Hernandez, Richardson, and Solita, had been harassing and

threatening Isabel Gomez into giving false testimony to inculpate Mr. Soto. Every few days, these Defendant Officers threatened Isabel Gomez to try to intimidate her into cooperating.

92.     When witnesses refused to cooperate, Defendant Officers and ASA Defendants made threats to try to intimidate them into cooperating, including threats of false charges.

93.     Defendant Officers and ASA Defendants never disclosed this mistreatment of witnesses during their interrogations, and Defendant Officers withheld all police reports documenting their coercive and improper tactics.

94.     These witnesses subsequently averred in affidavits that the Defendants were attempting to force them to falsely corroborate a supposed gang meeting on August 16, 1981, and to inculpate Mr. Soto or David Ayala, or both.

95.     Defendant Officers, including Defendants Foster and Hernandez, wrote false narratives of what transpired during these interrogations in police reports and suppressed the abusive and coercive tactics Defendants used to intimidate witnesses into giving false testimony that inculpated Mr. Soto.

96.     Based on the evidence fabricated by Defendants, Mr. Soto was charged with the double murder.

97.     There was never any probable cause to suspect Mr. Soto of the murders at Pietrowski Park.

**Coerced and Incentivized Trial Testimony**

98.     In September 1982, Ayala, Mr. Soto, and Palomo went to trial.

99.     Cruz provided the only trial testimony falsely implicating Mr. Soto and Ayala.

100.    Not one of the individuals that Cruz claimed was at David Ayala's house the night of the crime corroborated his fabrications.

101.    In fact, no other witness than Cruz implicated Mr. Soto in the crime.

102.    Instead, multiple witnesses testified to refute Cruz's coerced and false account.

103.    Palomo, who later pled guilty to one count of murder for the shooting at the park, has also sworn that he did not attend any supposed meeting at Ayala's house on the day of the shooting nor did he take any orders from Ayala or Mr. Soto.

104.    Other witnesses have also sworn that Wally Cruz admitted that he was intimidated by Defendants into lying to inculpate Mr. Soto and his co-defendant Ayala. In particular, Cruz's cousin and friend, Joseph Cruz, averred that Cruz repeatedly talked to him about being forced to falsely inculpate Mr. Soto and Ayala.

**Suppression of Evidence of Misconduct and Exculpatory Information**

105.    Throughout the State's prosecution, Defendant Officers withheld material exculpatory and impeachment evidence from the trial prosecution as well as Mr. Soto and his defense team, including the evidence of their own misconduct.

106.    Defendant Officers did not disclose, among other things, their fabrication of evidence to Mr. Soto, his counsel, or the prosecutors, in advance of or at the time of the criminal trial.

107.    Defendant Officers used false police reports to cover up their actions. They provided those false reports to prosecutors, and their fabricated evidence became the basis for charging and prosecuting Mr. Soto.

108.    Defendant Officers also gave false statements to trial prosecutors.

109.    Mr. Soto's arrest and prosecution was based solely on the evidence fabricated by Defendants and thereafter suppressed by Defendant Officers.

110. Absent Defendants' misconduct, Mr. Soto would never have been arrested, prosecuted, or convicted.

## Plaintiff's Wrongful Conviction

111. On September 30, 1982, Mr. Soto and Ayala were convicted on all charges.

112. Soto was sentenced to two life-without-parole sentences for the murder convictions, thirty years' incarceration for the attempt murder, and seven years for the conspiracy.

113. The foreseeable consequence of Defendants' actions was that Mr. Soto would be wrongfully convicted of the shooting. Indeed, the very purpose of Defendants' actions was to frame Mr. Soto, an innocent man, for a crime he did not commit.

114. In addition, upon information and belief, Defendant Officers suppressed and destroyed additional evidence still unknown to Mr. Soto, which would have been exculpatory, impeaching, or shown Plaintiff's innocence.

## Plaintiff's Exoneration

115. Mr. Soto has always maintained his innocence and has pursued all legal avenues to prove it.

116. On December 14, 2023, after years of post-conviction advocacy by Mr. Soto, the Cook County State's Attorney's Office asked the court to vacate Mr. Soto's conviction. All charges were dropped.

117. Mr. Soto was released that day.

118. James Soto and David Ayala had each spent over 42 years in custody from the date of their arrests. At the time of their release, they had been wrongly incarcerated longer than any other Illinois exoneree.

**The City of Chicago's Policies, Practices, and Customs
Caused James Soto's Wrongful Conviction**

119.     The City is responsible, by virtue of its policies, practices, and customs, for inflicting miscarriages of justice in scores of incidents like the one Mr. Soto endured.

120.     In the early 1980s, City of Chicago final policymakers were made aware that police officers were engaged in an unconstitutional pattern of suppressing investigative materials through two cases: *Palmer v. City of Chicago* and *Jones v. City of Chicago*. In April 1982, Chicago officials, including Chicago Police Department Superintendent Richard Brzeczek, became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional evidence suppression practice that caused his wrongful prosecution.

121.     In *Jones*, Detective Frank Laverty developed strong evidence that Jones could not have committed the murder. But, as stated by the Seventh Circuit, this evidence was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files." *Jones v. City of Chicago*, 856 F.2d 985, 995-96 (7th Cir. 1988).

122.     In the spring of 1982, Detective Laverty learned that Jones was on trial for the murder; he told his Commander that an innocent person was being prosecuted, but his Commander took no action; and Laverty then informed Jones's criminal defense attorney about the information in the undisclosed file. The court declared a mistrial, and the State's Attorney dropped all charges against Jones. Jones then filed a civil lawsuit stemming from the withholding of important investigative information in an undisclosed file, resulting in his wrongful prosecution. His case resulted in a jury verdict finding a custom of maintaining documents with important investigative material that were withheld from the State's Attorney's Office and criminal defendants.

123.     In 1988, in *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988), the Seventh Circuit affirmed the jury verdict in favor of George Jones, including the finding that the City of Chicago had maintained an unconstitutional practice of evidence suppression, permitting detectives to keep important investigative information undisclosed to criminal defendants.

124.     In April 1982, shortly after the Laverty revelations about the non-disclosure of important investigative materials, a class action lawsuit called *Palmer v. City of Chicago* was filed to challenge the use of informal files to suppress investigative materials, and, days later, the Honorable Judge McMillen issued a temporary restraining order requiring the CPD to preserve all investigative materials not included in formal police files. By September 1982, the action was transferred to the docket of the Honorable Milton Shadur, who thereafter granted a preliminary injunction on the matter.

125.     At this time, there was a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files not subject to disclosure. The information in the memos and notes was not making it into official reports. In addition, official reports often were not written right away, and instead were written only once they had settled on a suspect, at which point investigators might consider alternate suspects and other evidence to be non-pertinent. As a result, entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed once an investigation was complete.

126.     Indeed, these cases established that, at the time of Mr. Soto's investigation in 1981 and resulting conviction in 1982, there was a policy and practice of suppressing exculpatory and/or

18

impeaching material in clandestine files at all relevant times, including at the Area Four Detective Division during the investigation into the Pietrowski Park murders.

127.    Since 1981, at least 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of an innocent person for serious crimes they did not commit.

128.    In addition, the City routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced statements at the time of the events at issue in this case.

129.    In addition, the City routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

130.    Before and during the period in which Mr. Soto was falsely charged with and convicted of murder, the City also knowingly operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the City's disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

131.    As a result, Chicago police detectives and their supervisors were able to engage in rampant misconduct with impunity, and as a result caused scores of wrongful convictions just in Area Four, where Defendant Officers were assigned, and hundreds more City-wide.

132.    The City also failed in the years prior to Soto's conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.  The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses;

b.  The constitutional requirement to preserve and disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding;

c.  The conduct of live lineup, photographic, and other identification procedures;

d.  The risks of wrongful conviction and the steps police officers should take to minimize risks;

e.  The risks of engaging in tunnel vision during investigation; and

f.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

133.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Soto's wrongful conviction and his injuries.

134.    The City also failed to appropriately supervise its officers. The United States Department of Justice ("DOJ") issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training," and the deficiencies mirror those alleged here. In addition, the DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when

they violate the law or CPD policy." In particular, the DOJ found that the City failed to investigate nearly half of misconduct complaints. Where investigations did occur, there were "consistent patterns of egregious investigative deficiencies," and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.

135.    Since before Mr. Soto's arrest and continuing for years afterward, municipal policymakers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

136.    Numerous municipal policymakers have even admitted the code of silence exists.

137.    The City practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the CPD. As a result of these practices, members of the CPD act with impunity when they violate the constitutional and civil rights of citizens, knowing the City's lack of discipline and supervision and its code of silence will protect them.

138.    Defendant Officers engaged in the misconduct described herein because they had no reason to fear that the City would ever discipline them for doing so.

139.    Part and parcel with this history of fostering egregious misconduct, the CPD has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from witnesses and suspects in criminal cases, which has caused false confessions and led to wrongful convictions.

140.     This history goes back at minimum to the 1980s and continued well into the 2000s and includes the conduct of infamous Chicago police detectives, including Jon Burge, Michael McDermott, Kenneth Boudreau, Kriston Kato, Reynaldo Guevara, and many others. For instance, Defendant Guevara has framed dozens of other innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

141.     As of the filing of this complaint, at least 47 men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, John Martinez, Thomas Kelly, Jose Tinajero, Louis Robinson, Fabian Santiago, Oscar Soto, Tony Gonzalez, and Edwin Ortiz. Collectively, these men and women served hundreds of years in prison for crimes they did not commit.

142.     Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including (a) manipulating witnesses, (b) fabricating evidence, (c) suppressing exculpatory information, including fabricated information, (d) coercing false confessions and false statements from suspects and witnesses using

physical and psychological violence, and (e) using other unlawful tactics to secure the arrest, prosecution, and conviction of persons, without regard to their actual guilt.

143.     In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

144.     Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

145.     Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. The allegations Defendant Guevara has refused to respond to include allegations that he has manipulated dozens of witnesses to provide false identifications, he has fabricated false evidence, he has suppressed exculpatory evidence, including documentary evidence, he has tortured and abused suspects and witnesses and has coerced false statements from them.

146.     Defendant Guevara never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

147.     In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendant Officers in this case. Defendant Officers engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

148.     In 2019, the Federal Bureau of Investigation ("FBI") and DOJ confirmed that CPD supervisor Jon Burge was aware that on numerous occasions, detectives he was supervising participated in the psychological and physical abuse of persons being questioned.

149.     Furthermore, CPD officers systematically suppressed exculpatory and impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

150.     The City's failure to train, supervise, and discipline its officers, including Defendant Officers, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Mr. Soto in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

151.     The City and final policymaking officials within the CPD failed to act to remedy the patterns of abuse described in the preceding paragraphs despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Soto's ongoing injuries.

152.     The policies and practices described in the foregoing paragraphs were also approved by final policymakers for the City, who were deliberately indifferent to the violation of constitutional rights described herein.

**James Soto's Damages**

153.     For 42 years, Mr. Soto was forced to live in a cage and serve out a punishment for a crime he did not commit, with the threat that he would die in prison before being exonerated.

154.     Mr. Soto was required to live in conditions that were inhumane and damaging to his physical and mental health. A constant atmosphere of fear, distrust, threats, and violence from prisoners and correctional staff alike permeated the prison environment. For over four decades, Mr. Soto's life was marked by a steady stream of human rights abuses.

24

155.    During his wrongful incarceration, Mr. Soto was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, funerals, and other life events with loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

156.    Mr. Soto's four decades of wrongful incarceration forced him into a world of isolation in which he lost contact with many of his friends and family in the outside world.

157.    He was deprived of meaningful opportunities for education, and worked tirelessly to create opportunities for himself despite his incarceration. He was unable to work and missed out on the lives of his family and friends.

158.    Mr. Soto was robbed of opportunities to pursue his interests and passions, build relationships, and continue the community work that provided his life with meaning.

159.    Mr. Soto has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being. Mr. Soto must now attempt to make a life for himself outside of prison without the benefit of over four decades of life experiences, which normally equip adults for the task.

160.    Mr. Soto lived in constant emotional anguish, never knowing whether the truth would ever come out and whether he would ever be exonerated.

161.    As a result of the foregoing, Mr. Soto has suffered tremendous damage, including loss of liberty, physical injury, psychological trauma, and emotional damages, all caused by Defendants' misconduct.

## LEGAL CLAIMS

## COUNT I – 42 U.S.C. § 1983

### Violation of Due Process Under the Fourteenth Amendment

162.    Each paragraph of this Complaint is incorporated as if restated fully herein.

163.    As described above, Defendant Officers and ASA Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Mr. Soto of his constitutional right to due process and a fair trial.

164.    As described above, Defendant Officers and ASA Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Mr. Soto, suborned perjury, obtained Mr. Soto's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Mr. Soto in his criminal case.

165.    As described above, Defendant Officers deliberately withheld exculpatory and impeachment evidence from Mr. Soto, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Mr. Soto's criminal prosecution.

166.    Defendant Officers also destroyed and/or intentionally lost material evidence. In doing so, Defendant Officers violated their clearly established duties to disclose all exculpatory and  impeachment information to prosecutors, to preserve material evidence, and to ensure the integrity of eyewitness identifications and statements.

167.    Defendant Officers concealed and/or destroyed additional evidence that is not yet known to Mr. Soto.

168.    Defendant Officers and ASA Defendants fabricated additional evidence not yet known to Mr. Soto.

169.    Defendant Officers and ASA Defendants' misconduct resulted in Mr. Soto's unjust and wrongful criminal prosecution and conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Mr. Soto could not, and would not, have been pursued, and there is a reasonable probability that the outcome of Mr. Soto's criminal trial would have been different.

170.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Soto's clear innocence.

171.    As a direct and proximate result of Defendants' misconduct, Mr. Soto suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

172.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City, in the manner more fully described below in Count V.

## COUNT II – 42 U.S.C. § 1983

**Malicious Prosecution and Unlawful Detention (Fourth and Fourteenth Amendments)**

173.    Each paragraph of this Complaint is incorporated as if fully restated herein.

174.    As described above, Defendant Officers and ASA Defendants, acting as investigators and without probable cause to suspect Mr. Soto of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to

initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they know Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments..

175.    In so doing, Defendant Officers and ASA Defendants maliciously prosecuted Mr. Soto and caused Mr. Soto to be deprived of his liberty and detained without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. Specifically,  Mr. Soto  was incarcerated from the date of his arrest until 42 years later.

176.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Soto's clear innocence.

177.    As a direct and proximate result of Defendants' misconduct, Mr. Soto suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

178.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City, in the manner more fully described below in Count V.

## COUNT III – 42 U.S.C. § 1983

### Failure to Intervene

179.    Each paragraph of this Complaint is incorporated as if fully restated herein.

180.    As described above, during the constitutional violations described herein, one or more of Defendant Officers and ASA Defendants stood by without intervening to prevent the violation of Mr. Soto's constitutional rights, even though they had the duty and the opportunity to do so.

181.    Defendant Officers and ASA Defendants had reasonable opportunity as well as the duty to prevent this harm but failed to do so.

182.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Soto's clear innocence.

183.    As a direct and proximate result of Defendants' misconduct, Mr. Soto suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

184.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City, in the manner more fully described below in Count V.

## COUNT IV – 42 U.S.C. § 1983

## Conspiracy to Violate Constitutional Rights

185.    Each paragraph of this Complaint is incorporated as if fully restated herein.

186.    In investigating the Pietrowski Park murders, Defendant Officers and ASA Defendants agreed among themselves and with other individuals to act in concert in order to deprive Mr. Sot of his constitutional rights, including his rights to due process and a fair trial, as described above.

187.    Additionally, before and after Mr. Soto's conviction, Defendant Officers and ASA Defendants further conspired to deprive Mr. Soto of favorable information to which he was lawfully entitled and which would have led to not being charged, acquittal, or faster exoneration.

188.    In this manner, Defendant Officers and ASA Defendants, acting in concert with  other unknown co-conspirators, conspired by concerted actions to accomplish an unlawful purpose by unlawful means.

189.    In furtherance of the conspiracy, each co-conspirator engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence and withholding exculpatory evidence—and was otherwise a willful participant in joint activity.

190.    In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

191.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

192.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Mr. Soto suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

193.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others and with total disregard for the truth and Mr. Soto's clear innocence.

194.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

### COUNT V – 42 U.S.C. § 1983

### Policy and Practice Claim Against the City of Chicago

195.    Each paragraph of this Complaint is incorporated as if fully restated herein.

196.    As described in detail above, Defendant City of Chicago is liable for the violation of Mr. Soto's constitutional rights because his injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of final policymakers for the City.

197.    At all relevant times and for a period of time prior and subsequent thereto, the City and its final policymakers failed to promulgate proper or adequate policies or procedures for: the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; the conduct of interrogating witnesses and obtaining their statements and testimony; and maintenance of investigative files and disclosure of those files in criminal proceedings.

198.    The City and its final policymakers failed to promulgate adequate policies or procedures on these topics although the need for such policies and procedures was obvious, given the recurring situations faced by officers, in order to prevent the violation of citizens' constitutional rights.

199.    In addition, the City and its final policymakers failed to promulgate proper or adequate policies or procedures   for training, supervision, and appropriate discipline of CPD officers on these topics.

200.    The failure to promulgate proper or adequate policies or procedures was committed by persons with final policymaking authority in the CPD and the City.

201.    At all relevant times and for a period of time prior thereto, there existed widespread practices and customs among officers of the CPD, under which criminal suspects and witnesses were coerced to involuntarily implicate themselves or others by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were

subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional rights; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers such that the coercive interrogations continued unchecked.

202. In addition, at all relevant times and for a period of time prior thereto, there existed widespread practices and customs among officers or agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

203. At all relevant times and for a period of time prior thereto, the City and its final policymakers had notice of the above-referenced widespread practices and customs. For instance, it was common that suspects were prosecuted based on fabricated evidence and/or coerced confessions, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures, and that exculpatory and impeaching evidence was suppressed.

204.     The widespread practices and customs described above, individually and together, were allowed to flourish because the leaders, supervisors, and final policymakers of the City directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers on these topics, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Mr. Soto.

205.     The above-described widespread practices and customs, so well settled as to constitute de facto policies of the City, were able to exist and thrive, individually and together, because final policymakers exhibited deliberate indifference to the problem, thereby effectively ratifying it.

206.     The policies, practices, and customs set forth above have resulted in numerous well-publicized wrongful convictions, including the one at issue here, where individuals were convicted of crimes they did not commit after witnesses were subjected to coercive interrogations and/or unduly suggestive identification procedures.

207.     In addition, the misconduct described herein was undertaken pursuant to the policies and practices of the City in that the constitutional violations committed against Mr. Soto were committed with the knowledge or approval of persons with final policymaking authority for the City or were actually committed by persons with such final policymaking authority.

208.     Defendant Officers acted pursuant to the City's policies, widespread practices, and customs in engaging in the misconduct described in this Complaint.

209.     Mr. Soto's injuries were directly and proximately caused by the City's policies, widespread practices, and customs.

210.    Specifically, Mr. Soto's injuries were caused by the policies, widespread practices, and customs of the City in that officers and employees of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced suspect and witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated constitutional rights in a manner similar to that alleged here.

211.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and suspect or witness statements, and pursued wrongful convictions.

212.    Indeed, the CPD's systems for investigating and disciplining police officers accused of the type of misconduct that affected Mr. Soto was and is, for all practical purposes, nonexistent. The CPD maintained a code of silence that effectively eliminated any form of accountability, discipline, or oversight.

213.    Chicago police officers who manufactured criminal cases against individuals like Mr. Soto had every reason to know not only that they enjoyed de facto immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter the cost. In this way, the City proximately caused abuses like Defendant Officers' misconduct at issue in this case.

214.    As a direct and proximate result of Defendant City's policies, widespread practices, and customs, Mr. Soto suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**COUNT VI – State Law Claim**

**Malicious Prosecution**

215.     Each paragraph of this Complaint is incorporated as if fully restated herein.

216.     Defendant Officers and ASA Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, accused Mr. Soto of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

217.     Defendant Officers and ASA Defendants caused Mr. Soto to be improperly subjected to judicial proceedings for which there was no probable cause.

218.     These judicial proceedings were instituted and continued maliciously, resulting in injury.

219.     Statements of Defendant Officers and ASA Defendants regarding Mr. Soto's alleged culpability were made with knowledge that said statements were false and perjured. Defendants also fabricated evidence, coerced false inculpatory statements from witnesses, and withheld exculpatory evidence that would have demonstrated Mr. Soto's absolute innocence,  destroyed material and/or exculpatory evidence, and used unduly suggestive identification procedures.

220.     Defendant Officers and ASA Defendants were aware that, as described more fully above, no true or reliable evidence implicated Mr. Soto in the Pietrowski Park murders.

221.     Defendant Officers and ASA Defendants intentionally withheld from and misrepresented to the trial prosecution facts that further vitiated probable cause against Mr. Soto, as set forth above, and withheld the facts of their manipulation and the resulting fabrications from Mr. Soto.

222.    The judicial proceedings were terminated in Mr. Soto's favor when all charges against him were dropped in December 2023.

223.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Mr. Soto's clear innocence.

224.    As a direct and proximate result of Defendants' misconduct, Mr. Soto suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT VII – State Law Claim

## Intentional Infliction of Emotional Distress

225.    Each paragraph of this Complaint is incorporated as if fully restated herein.

226.    The acts and conduct of Defendant Officers and ASA Defendants as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority and were undertaken with intent to cause, or were in reckless disregard of, the probability that their conduct would cause, severe emotional distress to Mr. Soto, as more fully alleged above.

227.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Mr. Soto's clear innocence.

228.    As a direct and proximate result of Defendants' misconduct, Mr. Soto suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional distress and damages, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII – State Law Claim

## Civil Conspiracy

229.     Each paragraph of this Complaint is incorporated as if fully restated herein.

230.     As described above, Defendant Officers and ASA Defendants, acting in concert with other known and unknown co-conspirators, reached an agreement among themselves to frame Mr. Soto for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. Soto of these rights.

231.     In furtherance of the conspiracy, Defendant Officers and ASA Defendants committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Mr. Soto and the intentional infliction of emotional distress upon him.

232.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Mr. Soto's clear innocence.

233.     As a direct and proximate result of Defendants' conspiracy, Mr. Soto suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT IX – State Law Claim

## Willful and Wanton Conduct

234.     Each paragraph of this Complaint is incorporated as if fully restated herein.

235.     At all times relevant herein, Defendant Officers and ASA Defendants had a duty to refrain from willful and wanton conduct in connection with the Jones murder investigation.

236.    As described herein, it was foreseeable to Defendant Officers and ASA Defendants that fabricating evidence, and suppressing exculpatory evidence, in addition to the other misconduct alleged above, in order to frame Mr. Soto, would inevitably result in extreme harm to him. Avoiding this injury to Mr. Soto would not have burdened Defendant Officers or ASA Defendants in any way.

237.    Notwithstanding that duty, Defendant Officers and ASA Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Mr. Soto's rights.

238.    As a direct and proximate result of Defendants' misconduct, Mr. Soto suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT X – State Law Claim

### *Respondeat Superior*

239.    Each paragraph of this Complaint is incorporated as if restated fully herein.

240.    In committing the acts alleged above, each of Defendant Officers were members and agents of, the CPD, acting at all relevant times within the scope of their employment and under color of law.

241.    Defendant City of Chicago is liable as principal for all torts committed by its agents under state law.

242.    .In committing the acts alleged in the preceding paragraphs, each of the ASA Defendants were employees of, and agents of the CCSAO, acting at all relevant times within the scope of their employment and under color of law.

243.    Defendant Cook County is liable for torts committed by its agents under state law.

### COUNT XI – State Law Claim

### Indemnification

244.    Each paragraph of this Complaint is incorporated as if restated fully herein.

245.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

246.    Defendant Officers are or were employees of the CPD, who acted within the scope of their employment in committing the misconduct described herein.

247.    Defendant City of Chicago is responsible for paying any judgment entered against Defendant Officers. Mr. Soto therefore demands judgment against Defendant City of Chicago in the amounts awarded to Mr. Soto against Defendant Officers as damages, attorneys' fees, costs, and interest.

248.    ASA Defendants are or were employees of the CCSAO, who acted within the scope of their employment in committing the misconduct described herein.

249.    Cook County is responsible for paying any judgment entered against ASA Defendants. Mr. Soto therefore demands judgment against Defendant Cook County in the amounts awarded to Mr. Soto against ASA Defendants as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff James Soto respectfully requests that this Court enter judgment in his favor and against Defendants WILLIAM FOSTER, ERNEST HERNANDEZ, JAMES SCHMIDT, B. MILLER, E. LABIAK, STEPHEN CASTO, THOMAS RICHARDSON, THOMAS PTAK, MICHAEL DUFFIN, RICHARD SOLITA, REYNALDO GUEVARA, R. JOHNSON, DENNIS MADERAK, W. ANDERSON, IVORY HAMPTON, ANTHONY PECORARO, ANTHONY KUTA, ROMAN TAPKOWSKI, R. KUROWSKI, S. BYCZEK, VINCENT TONDRYK, KENNETH MANN, P. WILINDEZ, STRAZA, MICHAEL MCMEEL, EVANS, NORBERT FERET, EARL ZUELKE, E.

39

PICKETTE, PHILLIP SZPICKI, N. DUB, JOHN REGAN, the UNIDENTIFIED POLICE OFICERS, the CITY OF CHICAGO, GREGG OWEN, TIMOTHY MCMAHON, JACK SMEETON, and COOK COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the individual Defendants, pre- and post-judgment interest, and any other relief that this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff, JAMES SOTO, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**JAMES SOTO**

BY:    /s/ Meg Gould
*One of Plaintiff's Attorneys*

Jon Loevy
Russell Ainsworth
Meg Gould
LOEVY & LOEVY
311 N. Aberdeen
Chicago, Illinois 60607
(312) 243-5900
gould@loevy.com
*Counsel for Plaintiff*